Case No. 22-2813, Valtis v. Chapdelaine. Mr. Durling, whenever you're ready. May it please the Court, James Durling on behalf of Plank of Appellants. This appeal concerns the constitutional rights of nine men previously held at the MacDougall Walker Correctional Institution in a unit called QPOD. The men were detained in QPOD for extended periods of time under harsh and restrictive conditions. For instance, they were confined to their cells for almost the entire day with limited social interactions. They were restricted access to prison programs and privileges, and they were denied or restricted in their ability to practice their religions. Construing the evidence in their favor, as is required at summary judgment, the record establishes the violation of several clearly established constitutional rights. The District Court correctly recognized that at least some of the plaintiffs could potentially prevail on their constitutional claims, but it then wrongly proceeded to grant all the defendants qualified immunity. In doing so, the District Court committed two overarching errors. First, it misapplied the analysis for qualified immunity, defining the rights at issue too narrowly and requiring case law directly on point. Second, it failed to construe all evidence to ambiguities in the record and the light most favorable to plaintiffs. For those reasons, and for the reasons set out more fully in our briefs, this Court should reverse the grant of summary judgment on the federal claims and reinstate the state law claims. On the free exercise claim, of the nine plaintiffs, as I see it, only Balthus and Tarasco actually alleged a sincerely held religious belief. Is that right? The other seven, I just did not see that. So I would say first of all, Your Honor, in the District Court, the defendants only argued that they were not burdening the plaintiffs' religious beliefs. They never disputed that the plaintiffs had sincerely held religious beliefs. And as this Court made clear in sealing the, sealing the guilt. So you don't have to establish an injury? I mean, doesn't it go to that? If you don't, if seven of the plaintiffs didn't even say that they have observed these beliefs, then what's the free exercise claim based on? So I think they did allege that they were being denied or restricted access in their religious beliefs. They all submitted affidavits of grievance forms complaining about that. And I think particularly construing that evidence combined with Mr. Balthus' affidavit saying that there were not religious practices at all in QPOD, I think that goes to show there was a burden and a substantial burden on the religious beliefs. And if the defendants felt that there was not sufficient evidence about whether they had sincerely held religious beliefs, they could have disputed that point in the District Court. And the fact that they did not, this Court's decision in Sealy v. Giltner makes clear that a plaintiff does not, or a non-moving party does not need to put forward evidence if the other side does not dispute the element to survive summary judgment. And as to the sweat lodge access in particular, am I right that it's just Tarasco who asked for that specifically as a, as a, something that he was part of his practice? I believe he was the only plaintiff who before, who specifically singled out sweat lodges. I think Mr. Balthus complained about religious services more generally, which I think could reasonably. Was his request for religious services enough to encompass everything that falls within it, in your view, for a free exercise claim? So I think it's clear, I think his request for religious services, and particularly his request for a sweat lodge, I think combined shows there's a substantial burden, even if only Mr. Tarasco mentioned a sweat lodge in particular. So to begin with a free exercise claim, as you know, the District Court granted qualified immunity to Mr. Balthus, to Mr. Tarasco. It did not address the claims brought by the other plaintiffs. We think that was wrong for the reasons laid out in our brief, but as to the grant of qualified immunity, the District Court defined the right at issue as the right to a sweat lodge or smudging, and we respectfully submit that is too narrow. As you know, this Court, and Salahuddin, and Wiggins, and Sevier, have repeatedly made clear that the relevant right is the right to engage in religious exercise, absent of peniological justification. And we think that those cases resolve the issue, but even, we also think it makes sense for two reasons. First, so if you're thinking about, qualified immunity is about a reasonable officer, and we're talking about a reasonable officer who has no peniological justification, that essentially means the officer is acting for wholly arbitrary reasons. And we don't think reasonable officers typically do things for wholly arbitrary reasons. I know you argue that defendants forfeited the peniological justification, but it looks like sweat lodges involve fire, and hot stones, and maybe some other heavy equipment. Do we just overlook sort of the common sense implications of that? I don't think it's overlooking common sense. I would say, first of all, Your Honor, in Salahuddin, this exact issue came up. The prison guards, the prison officials tried after the fact to point to peniological justifications, and this Court said that's not enough. You need to actually look to what their justifications were at the time. And I also think it's telling that, you know, I don't believe the defense had ever disputed that McDougall Walker had a sweat lodge, and Mr. Baltus pointed this out in his motion for reconsideration. And it appears that, historically, they also had a sweat lodge. So I think that undermines any claim that sweat lodges were just too dangerous as a peniological matter. So returning to why it makes sense to define the right the way that Salahuddin, Wiggins, Speer all defined the relevant right, I also think it's problematic to define it in terms of particular religious practices, given that the direction of this Court's case law is not scrutinizing the religiosity or the significance of religious beliefs. You know, in Ford v. Guinness, as well as in Kravitz, the Court made clear. Sorry, Judge Carney, if you have a question. Yeah, I just wanted to ask about the individual defendant's personal involvement in what occurred, I guess. Yes. Could you describe that as to each defendant briefly? Yes. So once again, we begin with the threshold point that they did not dispute their personal involvement below. So under C. Levi-Giltner, we did not need to put forward affirmative evidence, but we think there also is affirmative evidence in the record, specifically as to defendants Chaptolaine and Mudano. There are signed grievance forms that— This is the warden? The warden is Chaptolaine, yes. There are signed grievance forms that appears to be her signature, and the plaintiffs all submitted, or almost all of them submitted affidavits specifically saying that they— Could you just slow down a tad? Oh, yes. My apologies.  Let me just pause you there, too. How did the signed grievance forms, even assuming that those were their names, indicate their personal involvement in decision-making to deny specific requests? I think it shows that they were aware that the plaintiffs were disputing they were not being provided religious services and did not seem to correct it in any way. And it's not just the signed grievance forms. The plaintiffs in their affidavits and in the grievance forms pointed out that they had made requests to the warden and deputy warden and that they were not corrected. So that would be the evidence that we would point to. And I would finally say Mr. Platt-Castellano has an affidavit that describes a conversation in which a prison counselor said— And from that, we would infer that the lack of addressing—the failure to address these concerns is their responsibility? Yes, the repeated failure to correct the denial of religious services is their responsibility. Because we presume that based on their positions that they had the authority to remedy the wrong. Correct. Is that right? Yeah. So we would also—that's on the free exercise claim. As you know, we're also raising a due process claim. We would submit that the record—the evidence construed in the light most favorable to plaintiffs show both that plaintiffs were confined in QPOD for extended periods of time, up to and beyond three months. In addition, that the conditions were harsh and atypical and significant compared to the conditions in general prison population. And that includes the fact they were confined in their cells for longer periods of time. They were not allowed to eat with their cellmates. There were unsanitary conditions caused by restrictions on use of toilet. As well as the denial of religious services, which is relevant not just to our free exercise claims, but also— You think the record supports that those deprivations were at a level that were atypical and significantly more severe than in the general population? Yes, we would— So there's been litigation about this before, hasn't there? What's your strongest case supporting that this was a significant increase in severity? So we would point to decisions like Palmer, in particular, that kind of surveys the court's prior cases and describes the types of conditions that make something atypical and significant, which in turn restricted confinement, unsanitary conditions. And we'd also point to Taylor v. Rodriguez, which makes clear that— So what are the unsanitary conditions here? The unsanitary conditions were that toilets would be turned off are the— Well, if they keep flushing them over and over. But if they don't get turned off, if they don't do that, I thought they get to flush it twice within, what is it, twice within five minutes. So the district court recognized that there's a dispute of fact on what exactly, when exactly toilets would be turned off. But that says when. But also how long they'd be turned off for. But if you don't flush it too much, if you don't flush it in too close a sequence, they never get turned off, right? I believe that is correct, that it would require repeated flushing. You know, I don't believe the record discloses under what conditions it would be turned off. But the plaintiff, Mr. Baltz in particular, at JA 310, talks about the fact that they would have to eat. Because they'd eat their meals in their cells, they'd have to eat next to toilets that were— But that's only if he was flushing it too much. Yeah, but I don't think the fact that you would have to flush a toilet multiple times necessarily means they're doing something improper. You know, sometimes toilets don't work properly. And so I think that still contributes to the overall— But he was told in advance. They all knew that these things are on a timer. I believe the defendants, I don't believe that the plaintiffs dispute that they were told this fact, yeah. And so, but I would point to Palmer as I think the best case, both in terms of the types of conditions that can render slang atypical and significant, and also how to conduct a qualified immunity analysis. And Palmer, the court, said the right was clearly established, even though they weren't able, the court was not able to point to a case involving the exact same conditions in the exact same period of time. I understand I'm over time, so as the court knows, we're also raising an Eighth Amendment claim, but I'm happy to reserve that for a vote. Thank you. Good morning. May it please the court, Assistant Attorney General Zenobia Graham-Days, here on behalf of the defendants, Commissioner Quiroz, Warden Chap Delane, as well as Deputy Warden McDonough. We believe that the district court got it right. There is no clearly established right under these circumstances to due process. This is not an atypical hardship because the conditions that the court reviewed were identical to conditions that were outlined in Galarza v. Irfi, Harnage v. Breider, Harnage v. Chap Delane, as well as Shakur v. Szymanski. Now, there are subtle differences between this case and those cases, but those distinctions do not change the fact that these conditions were conditions that an inmate would expect to encounter if their behavior necessitated it. This is not unusual or something that would rise to the level of atypical hardship. We also know that there is no state-created liberty interest. When it comes to the Eighth Amendment claim, we also recognize that there is no constitutional right to decide where you're housed. And when we look at these actual conditions, we know that those conditions do not rise to the level of a clearly established right. Now, part of this is recognizing that the district court relied on its experience as well as common sense. And there were things that the parties agreed to. And one of the most important things that the parties agreed to was the fact that McDougall Walker has 140 incidents a month. A month. So it's in that context that we're looking at the allegations that have been presented by retained counsel. And we're saying that he has failed to identify a clearly established right. So QPOT inmates don't share access to all the facilities as the general population, is that right? Like the library or recreation, those are handled separately? Yes, they do have access to the library separately. They do have a rec yard that included a full-size basketball court. They could decide whether or not they wanted to go outside and participate in basketball. But they're segregated from the general population? Yes, they are. And why is that? For reclassification purposes. This was an area where the prison officials were assessing what the next step would be with each of these individual defendants. I mean plaintiffs, excuse me. This is not a situation where we are talking about inmates that have model behavior. We're talking about inmates that, based on paragraph number nine, QPOT is used to encourage individual inmates to modify their behavior and make better choices. So would those rationales apply to access to the McDougall's sweat lodge? When it comes to access to the sweat lodge, we are mindful of the fact that we have to look at the record in totality. And so what we're saying is there is no absolute right to a sweat lodge. The prison officials should be in a position to make that determination. If there's a fire in the facility, they might not have access to a sweat lodge. If there's a suicide that requires a cold being called, then you know what? Prison officials have to make a determination. We're saying that this determination should be made by the prison officials. And under these circumstances, it was not clearly established that each of these plaintiffs have a constitutional right to access the sweat lodge. Is your view that the sweat lodge is or is not, or participation in a sweat lodge activity is or is not a religious activity, religious worship? We acknowledge that based on Yellow Bear, it could be a religious activity for Native- I don't know what that means that it could be. Native Americans, yes. And so individuals that practice Native American religious beliefs, yes. That's what we're saying. But what we're also saying is that each of these individual plaintiffs was obligated to establish prior to Kravitz that there was a substantial burden placed on their religious- Well, but they don't have to establish substantial burden, right? Now they- Kravitz is established, right? Yes, but we have to look at the law at the time that these incidents were occurring. And when this was happening- For purposes of what? Qualified immunity? Because that's what prison officials would have had to think of. Or for the actual claim, because I'm not understanding that. Which of the two? Both, because we're saying that the district court didn't have a crystal ball. The district court couldn't say, well, three years from now- Hang on a second. You're saying that if the district court found that there was no substantial burden, even though we now know from Kravitz that there doesn't need to be a showing of a substantial burden, we would affirm on the basis that there was no showing of substantial burden? No, that's not what I'm- Then I'm not understanding. I understand the qualified immunity point. I don't understand this point. What I'm saying is that each individual plaintiff is supposed to establish that their religious beliefs haven't been infringed upon. Kravitz changed the standard to lower that obligation. But even if we look at it, regardless of what standard we use, we're saying that that has not been satisfied. That threshold standard has not been met. And we are not talking about pro se plaintiffs. We're talking about plaintiffs that arrive retained by counsel. This isn't court appointed counsel. They arrive represented by counsel. And so with that in mind, we're saying that you have to establish that each of these individual plaintiffs had a religious belief that was infringed upon by these defendants. And under these circumstances, that's not the case. Could you break that down? Because when you say these plaintiffs did not have a religious belief that was infringed upon, that can have at least two components. One is they did not have the religious belief. And the second would be even if they did have the religious belief, it was not infringed. Do you agree there are at least those two components? Yes. So are you arguing one, the other, or both of those components? I'm arguing both. And the reason I'm arguing both is because the district court identified only two plaintiffs that established that they had a religious belief that were infringed upon. When we're looking at each of these plaintiffs- Then let's talk about those two. Okay. And why don't they win? Well, when we're looking at Mr. Baltus, Mr. Baltus says he was never able to practice his religious belief. Could you just speak up? I can't quite hear you. When we're looking at Mr. Baltus, Mr. Baltus is saying he was never able to practice his religious beliefs. That statement is contradicted by his own evidence, which is JA-71 in the record. And that is the grievance that he submitted. And if we look at that, we're looking at the response that was provided by Warden Chapterling. And she makes it clear. She reviewed the grievance. She spoke to the bishop about it. The bishop indicated that although they're not able to smudge with the general population, they can engage in smudging in their selves. And so the court is not obligated to just overlook common sense and express it. I'm sorry for interrupting. But so your position is that there was no burden established on either Mr. Baltus's or Mr. Orozco's religious practices, and therefore you didn't have to submit a penological interest or evidence establishing a penological interest because there was no infringement. Yes. Is that right? Yes. But we also want to just acknowledge the fact that there is evidence in the record that there was a penological interest, even though that might not have been labeled as such. And I say that because when we're looking at paragraph number 21 and also the paragraphs that outline the fact that this is a facility that has a lot of different specialized units, a high volume of incidents per month, and we're dealing with an inmate population that some might label as problematic. And so all of this is dealt with in totality somewhat, in that even though no one is labeling it as a penological interest, it does reflect that. Where in the record? Paragraph 21. Paragraph 21. So I'm looking at, there are a few paragraphs that we believe kind of support what we're saying about that. We're looking at, I guess it would be easier if we focus on JA 296, which is the plaintiff's response to the Rule 56A1 statement. We know that based on the plaintiff's response to that statement, we can agree that McDougall had an assessment unit, high volume, high bond unit. Staff had to remain vigilant at all times because they were simultaneously maintaining different units. This is paragraph 6 that was admitted by the plaintiff. Paragraph 9, QPOD is an effective correctional tool to disincentive inmates from getting disciplinary reports. We agreed on that. That's paragraph number 9. Inmates being held responsible for their own behavior, that's paragraph number 10. Do you have anything specific here about the specific penological interest that was served by denying access to the sweat lodge or smudging, congregate smudging? At JA 120, there's, I think, an affidavit from Plaintiff Castellano talking about, I guess, Tarasco's request for access to the sweat lodge and the counselor responding that we're understaffed. That in and of itself is also another what could be considered a penological interest in giving prison officials the deference to decide how to allocate resources when staffing levels are limited. We have to take into consideration that these are decisions that prison officials make based on the circumstances that they're faced with. So why didn't you argue this? Your friend says that this is all forfeited because these are not arguments that you made. So for some reason, you did not insist on there being a penological interest. And it may be in the record. There may be places. And there may be common sense reasons why to restrict access to QPOD inmates. But I'm having a hard time understanding why you didn't make these arguments and what you should do about that. I disagree with his assessment that we did not make the argument. I think that the wording of the argument that was advanced below kind of allows. Give us pages in the record. I'm looking at JA 146. And what we're saying on JA 146, or what my colleague was saying on that page, is they have not established what is needed to go further. And so. So hang on. He directs us to 146. Tell me what you're. You argued there and why this is. Plaintiff has not given us for any basis for concluding that he cannot accomplish the mandates of his religious belief through the means of the defendants to provide in this prison. And when we. This is 146. J. A. 146. Where the joint appendix. The pair towards the end of the paragraph that starts with here. OK. And then. And then what sentence. Just go slowly so I can follow you. OK, so it says further claims arguing the denial of religious services fail when the inadequacy of the prison's current policy to satisfy inmates rights to religious exercise is not shown. OK, so where does that say that you have legitimate penalogical interests? I thought that what you've just pointed us to, I think, says. No, no, he is, in fact, able. These plaintiffs are able to perform their religious duty, so it's not as though. Yes, there is a restriction, but don't worry. We have a good reason for it. I think this language says. They can practice their religion, so there's no infringement at all, right? Yes, but if we go to the paragraph, if we turn to page 145, the change in policy. Yes, which is the previous page. The change in policy does not imply that the original policy was in violation of inmates First Amendment rights. I think that subtly what is being said is that my colleague is not conceding that there is a penological. But you're not arguing about the penological interest. This paragraph said they were able. They never suffered a lack of access. Yes. So there's no problem. But the penological interest argument is to say, well, look, maybe there has been a restriction on their ability to do what they want. But we have a legitimate reason. But here you're arguing that the premise has not been satisfied, right? Yes. So I guess I'm asking the separate question I thought we were talking about is where did you argue that there was a legitimate penological interest? And if the answer is that you didn't, that's fine. But I thought that's what you were offering to us. I'd like to focus on that point before pivoting to a different point. The argument was not labeled as a penological interest. It wasn't a direct argument. So what did you argue? That even if it did not have the label, must be construed as an argument that even if there was a restriction, it was justified. I would state that that is where I was referring to the paragraphs that the parties agreed to. And the paragraphs that I was referring to was the fact that the. But we're supposed to extrapolate from those facts that you were making a legal argument about penological interest. That's what you're saying, right? What I'm saying is we have to look at this in totality. And so when. No, I know. And you're saying if we look at the totality of the facts, we should infer that the reason you put those facts into the record was to make an argument even though you didn't talk about legitimate penological interest. No, that's not what I'm saying. Then what are you saying that's different than what I said? I did not prepare the record below when it comes to the motion for summary judgment. We're not faulting you. No, but I'm saying I can't. I can't speculate. I can't speculate as to why. But what I am saying here is that. When we're looking at the facts that were agreed upon, the court can look at those facts and make an assessment based on the information that has been presented. That is what I said. You're saying that based on the facts that were in there, even though there was no argument, we should infer from the facts that there's a legitimate penological interest, even though nobody made that legal argument. I'm saying that the court got it right when it decided that qualified immunity was appropriate. When it comes to the penological interest, that argument was not presented below. No. And when the court made its ruling, it did not definitively weigh in as it relates to that. But what I am saying is that when we're looking at this record in totality, we're looking at the fact that this is a facility that has 140 incidents a month. And so with that in mind, these individual defendants should have the discretion to make that determination. And that's not... And that's a legitimate penological interest argument. Well, no. And what box does it fit in? I'm not... What analytical box does that argument you just stated fit in? Why the law is not clearly established. And the reason I'm saying that that is why the law is not clearly established is because when we're looking at qualified immunity, we have to have notice. These individual defendants have to be on notice that their conduct is unlawful. And so when I say that that is part of the qualified immunity argument, I say that because if you're in a facility that has 140 incidents per month, there is no right to religious services if, for instance, there's a code, for instance, there's a fire, or if there's something like a staffing... If there's a right, you have the right. And then the question is whether there's a legitimate penological interest that allows the institution to decide that they can't allow you to exercise the right. But that's different, right? We're talking about two different analytical boxes here, whether there's a right to something and then whether there's a legitimate reason to basically not allow the right. Well, I think the issue is, is there a clearly established right for these individual defendants to have access to a sweat lodge? Because we can't look at it in broad terms. We have to look at it in terms that are not general, but terms that will put these individual defendants on notice. And so under these circumstances, Judge Shotney looked at this and said, it's not beyond debate. There is no legal authority that would establish these individual defendants would be... In this qualified immunity inquiry, there's two different components. One, do you have a clearly established right? Second, would these individual defendants have reasonably understood that they were violating the right? Those are two different inquiries, right? There are. But when this court made its decision, its decision was based on the fact that there is no clearly established right. You mean the district court? I'm sorry, the district court, yes. I'm sorry, Your Honor. When Judge Shotney made his decision, he indicated that there is no clearly established right. And unfortunately, while this case was pending, Judge Shotney died. No, no, no, Judge Shotney has not died. I'm sorry. Goodness. Judge Shotney did not die. Please forgive me. But he stepped down from the bench. Judge Shotney has not stepped down from the bench. Maybe he took senior status. I say that because Judge Shea addressed the motion for reconsideration, not Judge Shotney. And when Judge Shea addressed this motion for reconsideration, and my apologies to Judge Shotney. I'm so sorry, Your Honor. I'm a little flustered. Please forgive me. And I don't wish harm on Judge Shotney either. I'm sorry. You don't need to go any further than that. Judge Shea addressed the motion for reconsideration. And when he did that, he, too, agreed that the law was not clearly established. And opposing counsel wants to argue that it was foreshadowed. And what we're saying is it's not about whether or not it's foreshadowed. The question is whether it is beyond debate. And under these circumstances, it is not. Thank you, counsel. We'll hear rebuttal. Thank you, Your Honors. So first, I'd like to just address Judge Nardini's question about whether the standard is burden or substantial burden. We think on the merits, the standard is burden. For purposes of qualified immunity, we would acknowledge we would need to show a substantial burden because Kravitz postdates the conduct issue. But we actually think the standards are pretty similar under the prior substantial burden standard. The question is whether the denial was basically constitutionally de minimis. And there are numerous cases saying that denial of a single religious meal or single religious service could be a substantial burden. On the question of dry smudging, so first, we think there's a dispute of fact in that point. We cited a case in our brief that the fact there's a contradiction between the parties establishes the dispute of fact. It doesn't show that one party wins. So Baltus is after David says he wasn't able to do anything. He wasn't able to smudge at all. And I would separately note that dry smudging is not the same as smudging. Normal smudging is the burning of herbs. Dry smudging is when you use a feather. I don't know why that's a separate procedure. But even if you thought that he was allowed to dry smudge, we would still say there's a substantial burden by not being allowed to actually smudge. On the question of penal – Is that specified anywhere? That's not actually a dispute of fact then if what the state is saying is that he was allowed to do that in his cell individually, dry smudging. And he's just saying I wasn't allowed to do the burning. He said he wasn't allowed to smudge at all, which I think reasonably construed would be any kind of smudging, whether dry smudging or regular smudging. On the question of penological justifications, I think counsel, my friend on the other side, has now conceded that they did not argue below any penological justification. And she also did not argue on appeal any penological justification. And although she tries to point to various facts in the record, I think this court's decision in Salahuddin makes clear that prison officials can't rely on post hoc justifications. And one of the reasons why is that we're allowed to try to refute their penological justifications by showing that they're pretextual. And I think just allowing the other side to generically point to penological justifications would prevent us from doing that. On the question of clearly established, I still have not heard any ground for distinguishing Salahuddin, Sabir, or Wiggins. I think those cases do make beyond a doubt that plaintiffs had a right to practice their religions absent a penological justification. So if we were to agree with you that the right to engage in these religious practices was adequately established at the time and to send it back for further consideration proceedings, would the government at that point have the right to a use of penological interest, for example, to address the concerns I would have anyway about allowing fire in a cell? So I think there would need to be further briefing by both parties about whether the government would be allowed to file a subsequent motion for summary judgment. My understanding is that district courts do have discretion to entertain subsequent motions. I think we would also file our own motions, for example, to reopen discovery. But I think those are all things that the court should leave for the district court in the first instance on remand. Okay, thank you. I understand I'm over time, so I would just say that for the reasons set out in our briefing and our argument today, we respectfully request that the court reverse the grant of summary judgment. Thank you. Thank you, counsel. Thank you both. Thank you for your service. We'll take the case under advisement.